FILED
2012 APR -3  PM 4: 35
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CRIMINAL NO.  A-12-CR 137 SS |
| § | |
| DAVID JAMES JACOBY, § | |
| § | |
| Defendant. § | |

## FACTUAL BASIS

1.  Had this matter proceeded to trial, the United States Attorney for the Western District of Texas was prepared to prove the following facts beyond a reasonable doubt:

2.  Between 2009 and January, 2011, Defendant, DAVID JAMES JACOBY, was a physician licensed to practice medicine in the State of Texas who maintained a practice as an Emergency Room physician at The Hospital at Westlake Medical Center, in Westlake Hills, Texas.  Defendant did not maintain an independently-owned office where he treated patients and maintained patient files; nor was he a member of a physicians' practice group outside of the hospital.

3.  Brandon Dale Jacoby ("Brandon") was Defendant's son and was living with Defendant at Defendant's residence in the Austin, Texas area.   Between late 2009 and January 2011, Defendant was aware that Brandon Jacoby was serving a state probated sentence for a controlled substance offense.

4.  During this same time period, the Defendant was a user of hydrocodone, as well as the prescription drug carisoprodal, which was dispensed under the brand name Soma by Meda

Pharmaceuticals.

5. Between approximately 2009 to January, 2011, Defendant prescribed multiple controlled substances, including narcotics, benzodiazepines, and muscle relaxants, to family member(s) and/or associates of his son, Brandon, for non-medical purposes and with the understanding that Brandon and/or Defendant would receive a portion of the pills prescribed. Defendant would write these prescriptions within the Western District of Texas; primarily while at the hospital or at his residence. The prescriptions would be filled at pharmacies within the Western District of Texas.

6. On or about December 19, 2010, Defendant's son, Brandon, was found dead at the home he shared with Defendant. The autopsy report indicated that Brandon, who had a known history of illicit and prescription drug abuse, died due to multiple drug toxicity. The toxicology report showed that carisoprodol, hydrocodone, diazepam, and other drugs were found in his system at the time of his death.

7. On or about December 19, 2010, officers investigating Brandon's death discovered multiple empty prescription pill bottles located under Brandon's bed. The majority of the pill bottles were labeled as having contained hydrocodone or carisprodol, and as having been prescribed by Defendant to individuals other than Brandon. Investigating officers later identified these individuals as Brandon's associates and one family member.

8. Pharmacy records show that starting in at least 2009, Defendant prescribed a combination of narcotics, benzodiazepines, and muscle relaxants, to approximately 24 individuals associated with Brandon, including the persons linked to the pill bottles found under Brandon's bed. Between early 2009 and January, 2011 approximately 28,750 units of hydrocodone were prescribed by the Defendant to individuals for non-medical purposes.

9. Records of communications made between Brandon and Defendant show that Defendant provided such prescriptions to Brandon's associates for non-medical purposes, and did so with the understanding that Brandon and/or Defendant would receive a portion of the pills prescribed in exchange for the prescriptions.

10. Hundreds of text messages between Defendant and Brandon were recovered from Brandon's cell phone subsequent to his death. When communicating via text messaging, Defendant and Brandon would refer to hydrocodone as "meds". The text messages included, but were not limited to, the following:

| From: Defendant | To: Brandon | Date: 3/10/10 | You need to take better care of your meds & should always keep them in a bottle with your name on it from that old Rx I wrote for you 2 years ago if you still have it. Come get some more if you need them. I would not get them from ▮▮▮▮, as she is worried you are taking too much again. . |
|---|---|---|---|
| From: Defendant | To: Brandon | Date: 3/10/10 | I believe you've been honest with me since you got out of CTTC, except it took you a while to admit to me about failing your surprise drug test in your 3/4 house & getting kicked out. ….. |
| From: Defendant | To: Brandon | Date: 3/10/10 | We're all good. Come on up to the hospital now! I'll leave the meds on my tire because I have to go back to the ER now to transfer a very sick patient. |
| From: Defendant | To: Brandon | Date: 05/05/10 | What did you call me about? I was with a patient |

| From: Brandon | To: Defendant | Date: 05/05/10 | **[Brandon provides name and date of birth of two individuals]** |
| From: Defendant | To: Brandon | Date: 05/05/10 | On my front drivers tire |
| From: Defendant | To: Brandon | Date: 05/05/10 | Did you get them? |
| From: Brandon | To: Defendant | Date: 05/05/10 | Tes [misspelling in original] |
| From: Brandon | To: Defendant | Date: 05/28/10 | Can I come get 3 meds and 2 soma please? |
| From: Defendant | To: Brandon | Date: 06/12/10 | Did you get your Somas? |
| From: Brandon | To: Defendant | Date: 06/12/10 | Yes |
| From: Brandon | To: Defendant | Date: 06/12/10 | How many somas did u leave me? 5? |
| From: Defendant | To: Brandon | Date: 06/12/10 | I meant to leave you 6. 1 could have fallen off or I might have made a mistake.  If you need more I can give you some, but I wrote some for ▇ that you can have.  Did ▇ & her leave yet to get it filled? |
| From: Defendant | To: Brandon | Date: 09/17/10 | Tell ▇ we can't give him a lot of meds because I'm going to A&M & they need to last us the weekend |
| From: Brandon | To: Defendant | Date: 10/09/10 | Do u have any meds i can take with me |
| From: Defendant | To: Brandon | Date: 10/09/10 | I locked your room last night because you forgot to |
| From: Brandon | To: Defendant | Date: 10/09/10 | Dont see em.  ▇ gunna call me when hes on the way to the hospital so i can get some meds.  I need some somas now too; before i go to the greenbelt with ▇ and his gf |
| From: Defendant | To: Brandon | Date: 10/10/10 | How many of each do you want? |
| From: Brandon | To: Defendant | Date: 10/10/10 | 2 and 4 |

| From: Brandon | To: Defendant | Date: 10/10/10 | or 3 and 4 incase ▮ needs one |
|---|---|---|---|
| From: Brandon | To: Defendant | Date: 10/15/10 | ▮ wants to know if he can do a scrip today. He said its been 18 days |
| From: Defendant | To: Brandon | Date: 10/21/10 | Put dome of the meds in my room or in my medicine bag, please. Some Soma, too |
| From: Defendant | To: Brandon | Date: 10/21/10 | Gimme! Gimmie! |
| From: Defendant | To: Brandon | Date: 10/14/10 | Brandon, can you take some scripts up to ▮ & ▮ |
| From: Defendant | To: Brandon | Date: 10/14/10 | ▮ goes to work at 3pm |
| From: Defendant | To: Brandon | Date: 10/14/10 | Car's unlocked & keys & scripts in console |
| From: Defendant | To: Brandon | Date: 10/14/10 | ▮'s covering the $ |
| From: Brandon | To: Defendant | Date: 12/01/10 | Can u write ▮ scrip for meds and soma |
| From: Defendant | To: Brandon | Date: 12/01/10 | K.  When are you coming up here? ▮ has some meds for you if you need some now |
| From: Brandon | To: Defendant | Date: 12/01/10 | Do you need Soma or does he? |
| From: Defendant | To: Brandon | Date: 12/01/10 | I do |
| From: Defendant | To: Brandon | Date: 12/05/10 | Are you OK for tomorrow, or do you need anything else before I leave at 6:40am for my 24 hour shift? I love you! |
| From: Brandon | To: Defendant | Date: 12/05/10 | If u could leave me some meds in the morning. Y im ok I love u too |
| From: Defendant | To: Brandon | Date: 12/05/10 | In the drawer of the coffee table. |
| From: Brandon | To: Defendant | Date: 12/05/10 | K |
| From: Brandon | To: Defendant | Date: 12/05/10 | The most ive ever taken is 8 by the way |
| From: Defendant | To: Brandon | Date: 12/13/10 | I forgot to give you meds.  Stop by after you pick up ▮ |

| From: Brandon | To: Defendant | Date: 12/13/10 | Were here in the garage |

11. Pharmacy records show that subsequent to the date of Brandon's death, Defendant continued to provide prescriptions for hydrocodone and/or carisoprodol to a number of the same individuals formerly associated with Brandon.

12. At all times between 2009 and 2011 when Defendant was writing prescriptions: Hydrocodone was a generic Schedule III controlled substance drug that was often compounded/combined with acetaminophen. Hydrocodone is an opioid narcotic analgesic that is a commonly abused prescription drug. In addition, at all times between 2009 and 2010 when Defendant was writing prescriptions, Norco was a brand name prescription drug manufactured by Watson Pharmaceuticals. Norco contained hydrocodone, a Schedule III controlled substance. Hydrocodone and/or Norco were all to be prescribed only when medically required and were to be taken only in a manner prescribed by a doctor for a particular patient for a specific period of time and based on medical need.

13. Under the Controlled Substances Act, Title 21, United States Code, Section 841(a) et seq., and Title 21, Code of Federal Regulations, Section 1306.04, a prescription for a controlled substance was not legal or effective unless it was issued for a legitimate medical purpose by a practitioner acting in the usual course of professional medical practice.

14. From in or around December, 2009, through in or about January, 2011, Defendant and Brandon and his associates knowingly and intentionally conspired and agreed with each other to obtain, distribute, possess with intent to distribute and dispense a mixture and substance containing a detectable amount of hydrocodone without a legitimate medical purpose and outside the usual course of professional medical practice.

15. Via the use of text messages, in-person conversations and phone calls Defendant, Brandon and Brandon's associates agreed with each other to obtain distributable amounts of controlled substances, including and primarily hydrocodone, through the use of invalid and fraudulent prescriptions based on no documented or verified medical need and in exchange for a "share" or portion of the controlled substances once the prescriptions were filled at pharmacies.

16. Defendant and his coconspirators used the following methods, among others, to obtain distributable amounts of hydrocodone:

a. In order to acquire drugs containing controlled substances for himself, Defendant wrote and issued unlawful prescriptions which he wrote on his Westlake hospital prescription pad to individual coconspirators who he did not provide care for or treat as patients in his professional capacity at the Emergency Room at The Hospital at Westlake Medical Center. These fraudulent prescriptions were for drugs containing the controlled substance hydrocodone, often in the form of Norco, as well as carisoprodal, in the form of Soma, and were provided to coconspirators, who were primarily friends and associates of Brandon Jacoby, without a legitimate medical purpose and outside the usual course of professional practice.

b. Once coconspirators filled prescriptions, they were instructed to return a portion of the prescribed pills to Defendant, often through Brandon Jacoby, and then they would keep a portion of the pills for themselves or to distribute to others.

c. The coconspirators filled the unlawful prescriptions written by Defendant at a variety of pharmacies across geographical areas to avoid detection by regulatory or law enforcement authorities. Illegal prescriptions for hydrocodone were filled at approximately sixty-nine (69) different pharmacies within the Western District of Texas.

17. Contrary to accepted medical practice, Defendant also prescribed controlled substances to patients at a casual meeting or informal visit without conducting a physical examination, proper testing, x-rays, or taking a medical history of such individuals to verify the claimed illness or condition, or only after conducting an extremely limited physical examination, and without reviewing drug screen tests or maintaining any medical records memorializing the patient visits. In other instances, Defendant issued unlawful prescriptions for controlled substances to coconspirators despite obvious indications that such coconspirators were abusing, misusing, or distributing the controlled substances he prescribed. These indications included, but were not limited to, the following: patients' reports of re-directing or giving away the controlled substances to others, (including his son, Brandon Jacoby), reports of overuse of the controlled substances by coconspirators, drug seeking behavior and excuses by coconspirators describing lost prescriptions.

18. Defendant continued to prescribe excessive amounts of controlled substances, knowing that such practice could result in overdoses, dependence, addiction, and, in some cases, death to those receiving the prescriptions.

19. As coconspirator 'patients' of Defendant's, coconspirators sought and received prescriptions from Defendant with the knowledge and understanding that Defendant was prescribing controlled substances to them with the expectation that they would return a portion of the prescribed controlled substances back to him without a legitimate medical purpose and outside the usual course of professional practice.

20. Defendant regularly provided funds to assist in the insurance co-pays that coconspirators were charged by pharmacies when filling the Defendant's prescriptions.

21. Lastly, prescription records reveal that 93.1% of the illegitimate hydrocodone

prescriptions written for identified coconspirator 'patients' were written by Defendant for 10 mg (milligram) combinations of hydrodocodone. By contrast, all other prescription records written by Defendant for hydrocodone for presumed legitimate patients reveal that 73.8% of the prescriptions were written for 7.5 mg (milligram) combinations and 18.1% of the prescriptions were written for 5 mg (milligram) combinations. Thus, Defendant was consistently prescribing larger dosage amounts of hydrocodone to illegitimate 'patients' than he was to presumed legitimate medical patients.

22. The government was prepared to prove the foregoing by physical evidence, forensic analysis, the Defendant(s) own admissions, and testimony of persons with knowledge of the foregoing events.

That, in summary, would be the evidence presented by the United States.

Respectfully submitted,

ROBERT PITMAN
United States Attorney

By: _____
GRANT SPARKS
Assistant United States Attorney
816 Congress Avenue; Suite 1000
Austin, Texas  78701
(512) 916-5858
State Bar No. 00792849

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2012, a true and correct copy of the foregoing instrument was filed with the Clerk of the Court. In addition, electronic copies of the foregoing instrument were transmitted via electronic mail to the following attorneys and via U.S. Mail.

Mr. Louis Leichter
Attorney for the Defendant

Mr. Gerry Morris
Attorney for the Defendant

GRANT SPARKS
Assistant United States Attorney